[Civ. No. 32487. Second Dist., Div. Five. Jan. 21, 1970.]

DAVID SHEFFET, Plaintiff and Respondent, v.
COUNTY OF LOS ANGELES et al., Defendants and Appellants.

**COUNSEL**

John D. Maharg, County Counsel, David D. Mix, Assistant County Counsel, M. L. Lathrop, David M. Ager and Douglas V. Hart, Deputy County Counsel, Garrick & Lane and James C. Foster for Defendants and Appellants.

Darby, Fleming, Anderson & Hager and Donald F. Yokaitis for Plaintiff and Respondent.

## OPINION

**STEPHENS, Acting P. J.**—This is an appeal by defendant County of Los Angeles (County) and defendant Gibco Construction, Inc. (Gibco) from a judgment of the Superior Court of Los Angeles County in favor of plaintiff and against defendants. The action was brought by plaintiff, as an owner of real property, against defendants for damages caused by surface waters and mud draining across and onto plaintiff's property and into the drainage ditch on plaintiff's property from the land and streets owned by the defendants; for an injunction ordering defendants to refrain from draining surface waters across plaintiff's land; and for an injunction ordering defendants to take corrective steps to prevent the draining of surface waters onto plaintiff's land and in plaintiff's drainage ditch in excess of the existing prescriptive rights of defendants. After a court trial, plaintiff was awarded $50 in damages against both defendants,[1] and the court issued the following injunction: "Defendants Gibco Construction, Inc., a corporation, and County of Los Angeles, and each of them, are enjoined from in any manner discharging onto the real property of Plaintiff or within the ditch located upon Plaintiff's property, in excess of Defendants' existing prescriptive rights, the surface waters which collect from time to time on said Defendants' lands, walks, curbs, drives, gutters and streets, and further, said Defendants, and each of them, are hereby ordered, directed and required to take corrective steps within 240 days hereto to prevent the said draining of surface waters onto Plaintiff's land and upon and in Plaintiff's ditch in excess of Defendants' existing prescriptive rights."

Plaintiff has owned and resided on the real property known as 396 East Mendocino Street in Altadena, California since 1952. Prior to March 1965, the property located across the street from plaintiff was higher and unimproved land. In March of 1965, defendant Gibco commenced construction of a subdivision on the property, then known as Tract No. 29892. The property was cleared of trees and brush in March of 1965, and grading was commenced during the months of April and May 1965. Plans for the subdivision were prepared by engineers employed by defendant Gibco, and were approved by defendant County. Contained in the plans were two one-block-long streets: Deodara (running east and west) and Oliveras (running north and south). After they had been completed and had passed final inspection, they were dedicated as public highways and accepted by defendant County "for all public purposes and liability attaching thereto." Due to this construction, the natural area available for absorption of surface waters on the tract was reduced by 51.4 percent. This reduction, combined

---

[1]At time of argument on appeal, both defendants waived appeal as to this portion of the judgment.

with the design of Oliveras and Deodara Streets, created an increased and different pattern of surface-flow from the tract, concentrating the run-off to and down Oliveras, which dead-ended at its intersection with Mendocino immediately north of plaintiff's easterly driveway apron. Prior to November 1965, plaintiff had experienced no flow of surface water onto his property from across the street. In various rainstorms between 1965 and December 1966, water and mud from the tract flowed onto and flooded plaintiff's property, via the overflow from Oliveras, across Mendocino and down the driveway on the east side of plaintiff's property, as well as mud and water from the tract being deposited in the drainage ditch on the west side of his land. Plaintiff made several complaints to the County and Gibco, but neither defendant took any steps to alleviate the problem of water and mud flowing from the tract.

On this appeal from the judgment, defendants raise five contentions: (1) the plaintiff did not act reasonably in protecting his property; (2) the injunction is vague, confusing, and incapable of being carried out; (3) an injunction does not lie where plaintiff has only suffered nominal damages; (4) plaintiff's drainage ditch is a natural watercourse and defendants may properly discharge surface waters into it; (5) by statute, defendant County is immune from liability in this case.

California courts follow a modified rule of civil law in determining the rights and liabilities of adjoining landowners with respect to the flow of surface waters.[2] As stated in *Keys* v. *Romley,* 64 Cal.2d 396, 409

[2]For a general discussion of surface waters and the civil law rule relating thereto, see 52 Cal.Jur.2d, § 723 et seq., Waters, p. 364; also, as what appears to have been a forerunner of *Keys* v. *Romley,* 64 Cal.2d 396 [50 Cal.Rptr. 273, 412 P.2d 529], *infra,* see *Voight* v. *Southern Pac. Co.,* 194 Cal.App.2d Supp. 907, at p. 910 [15 Cal. Rptr. 59].

The text of 1 Cal.Jur.2d, § 5, Adjoining Landowners, 732-733 is of particular interest. There it is noted that California has adopted the rule of the civil law as it relates to surface waters. (Since the text was written pre-*Keys* and pre-*Pagliotti* v. *Acquistapace,* 64 Cal.2d 873 [50 Cal.Rptr. 282, 412 P.2d 538], *infra,* we must add that the rule in California is now a *modified* civil law rule.) After stating that "the owner of higher land has no right, for his own relief, either to divert the surface water from his land onto adjoining land over which it would not naturally have flowed [citing *Turner* v. *Tuolumne County Water Co.,* 25 Cal. 397; *Wood* v. *Moulton,* 146 Cal. 317 [80 P. 92], or, by accumulating such water upon his own land, or in ditches or other like artificial channels, to precipitate it upon adjoining land in increased quantities or in a form different from that in which it is accustomed naturally to flow," the text then states, "It seems that this doctrine has no application to city lots. The owner of such a lot, in the exercise of proper dominion over his property, may make changes in its surface which are essential to its enjoyment, even though he may thereby interfere with the flow of water from or onto an adjoining lot." No citation of authority is given for this conclusion, and it appears to have been considerably limited by the subsequent statement, "If the owner of a city lot wishes to remove water, whether arising from rain or from a cause originating on his lot, he must conduct it directly

[50 Cal.Rptr. 273, 412 P.2d 529]: "No party, whether an upper or a lower landowner, may act arbitrarily and unreasonably in his relations with other landowners and still be immunized from all liability. [¶] It is therefore incumbent upon every person to take reasonable care in using his property to avoid injury to adjacent property through the flow of surface waters. Failure to exercise reasonable care may result in liability by an upper to a lower landowner. ■ It is equally the duty of any person threatened with injury to his property by the flow of surface waters to take reasonable precautions to avoid or reduce any actual or potential injury. ■ [¶] If the actions of both the upper and lower landowners are reasonable, necessary, and generally in accord with the foregoing, then the injury must necessarily be borne by the upper landowner who changes a natural system of drainage, in accordance with our traditional civil law rule." Thus, as the court in *Burrows* v. *State of California,* 260 Cal.App.2d 29, 32-33 [66 Cal.Rptr. 868] pointed out, *Keys* laid down three express rules: (1) if the upper owner is reasonable and the lower owner is unreasonable, the upper owner wins; (2) if the upper owner is unreasonable and the lower owner is reasonable, the lower owner wins; (3) if both the upper and lower owners are reasonable, the lower owner wins.[3]

Here, defendants argue that plaintiff failed to take any reasonable precautions to protect his property from the flow of water and mud. The trial court expressly rejected this contention.[4] Assuming that the rule of *Keys* is applicable here, unless there is no substantial evidence to support this finding, we are bound by the decision of the trial court. (*Mantonya* v. *Bratlie,* 33 Cal.2d 120, 128 [199 P.2d 677].)

Defendants contend that plaintiff acted unreasonably because he failed to take any affirmative action to protect his property and never consulted

---

from his lot to a sewer or other place for receipt and discharge of such water, and cannot discharge it upon the lot of another without the latter's consent." (See *Armstrong* v. *Luco,* 102 Cal. 272, 275 [36 P. 674].)

[3]We note that there is nothing in *Burrows* which suggests that *Keys* does other than modify the civil law rule relating to the diversion of surface waters, the result of which affected recoverable damages. *Keys* does not create a new or different cause of action, but does recognize that the absolute liability resulting from strict application of the civil law as to surface waters was unreasonable. Under the facts of that case, the court held that where an upper owner diverts surface waters in such manner as to do no damage to the lower owner because of the *actual,* though not natural, contours of the lower property, the lower owner may not *necessarily* recover for injury caused by his subsequent modification of the terrain, thus permitting the diverted waters to invade his property. It leaves open the question of whether the subsequent terrain modification was reasonable, as weighed against the upper owner's reliance upon the existent conditions.

[4]The rejection by the court of this contention is the finding of reasonableness on the part of plaintiff. It may be based upon reasonable inaction, as well as affirmative action.

any person or firm with respect to alterations in his property which might protect it from the flow of surface waters. ■ Defendants would have us read *Keys* as necessarily requiring affirmative action on the part of a lower landowner before he can complain of unreasonable surface water diversion by an upper landowner. However, such an interpretation of *Keys* would in many instances place an unreasonable burden on the lower landowner. All that he is required to do is act reasonably. *Keys* recognizes that, "New Jersey, which had been one of the pioneers in adopting the common enemy doctrine and had applied it with considerable strictness, abandoned the old rule in *Armstrong* v. *Francis Corp.* (1956) 20 N.J. 320 [120 A.2d 4, 59 A.L.R.2d 413]," and adopted a rule of reasonable use. It must be noted that in *Francis,* the cost of protecting the lower riparian owner's property was required to be borne by the upper owner. Thus, though California has had the very antithesis of the common-enemy rule relating to surface waters, and still does, except as modified by the *Keys* rule of reasonable use, it is not suggested in *Keys* that where additional burdens and protective measures are required to be taken by a lower owner, the cost thereof should not be borne by the party permitted to impose them.[5] The court recognized also that the lower owner's cause of action included the totality of the injury, past, present, and future (p. 411).

The companion case of *Keys* is *Pagliotti* v. *Acquistapace,* 64 Cal.2d 873 [50 Cal.Rptr. 282, 412 P.2d 538], in which the modified rule of *Keys* was applied. There, two private adjoining landowners each sought to enjoin the other. The lower owner sought to enjoin the upper from diverting surface waters at an increased rate and volume through a swale crossing the lower owner's property "in a concentrated manner." The upper owner sought to enjoin the maintenance by the lower owner of a dam obstructing the diversion of surface waters in the manner being done. The court held that if the upper owner acted reasonably and the resultant change in the manner of use of his natural right to expulsion of surface waters caused no appreciable damage to the lower owner, the upper owner could, with immunity to liability, modify the natural disposition of such waters. The trial court had required the upper owner to construct and maintain a drainage ditch across the lower land. It must have concluded that such

---

[5]The language used in *Keys* is as follows: "The gravity of harm is its seriousness from an objective viewpoint, while the utility of conduct is its meritoriousness from the same viewpoint. (Rest., Torts, § 826.) If the weight is on the side of him who alters the natural course, then he has acted reasonably and without liability; if the harm to the lower landowner is unreasonably severe, then the economic costs incident to expulsion of surface waters must be borne by the upper owner whose devlopment caused the damage." This *must* be read in the context of the facts then before the court. To hold otherwise would give a private upper landowner an absolute right to impose burdens upon the land of a lower owner by merely paying for the damages incurred. This would eliminate injunctive relief where the upper owner is acting unreasonably. Certainly this was not the court's holding.

a ditch caused *no appreciable* damage, but cost of construction and maintenance was to be borne by the upper owner. Such a result, though a modification or extension of the rule of *Francis,* was in conformity with the rationale of that case, and confirms our analysis. To the same effect is *Inns* v. *San Juan Unified School Dist.,* 222 Cal.App.2d 174, 177 [34 Cal.Rptr. 903], citing and approving the statement of the trial court that "An upper land owner has a natural easement or servitude which permits him to discharge surface waters through the drainage mechanism of a natural swale, hollow or depression. His right is limited to disposition of the water through the chosen channels of nature. He cannot increase the volume or velocity by collecting the water in pipes or artificial ditches. If he does so to the damage of the lower landowner, he is liable to the latter." ■ As the court in *Keys* stated: "The issue of reasonableness becomes a question of fact to be determined in each case upon a consideration of all the relevant circumstances, including such factors as the amount of harm caused, the foreseeability of the harm which results, the purpose or motive with which the possessor acted, and all other relevant matter." ■ Reasonable conduct may or may not require affirmative action by the lower owner, depending upon all the circumstances. The social utility of the upper owner's conduct must be weighed against the burden that such conduct would impose on the lower owner. More often than not, the lower owner's unreasonable conduct will consist not of his failure to take affirmative steps to protect his property, but of affirmative conduct increasing the danger to his property. In *Keys,* for example, the plaintiff had removed a dirt wall from the rear of his property, thereby permitting his land to be flooded. The court held that this act would have to be weighed against the defendants' act of changing the contours of their property in order to make a finding on the issue of reasonableness.

■ The person who *may* minimize damage and fails to do so cannot recover for the excess damage occurring.[6] On the other hand, a person who reasonably acts to minimize the damage should recover the costs of such "minimization" as damages. ■ Where, however, the injured person acts reasonably, by action to minimize the damage, or by inaction which does not unreasonably *increase* his damages, if there is a diminution in the value of his land also involved, we see no reason why he may not recover for the damage. This same rationale is expressed in *Inns* v. *San Juan Unified School Dist., supra,* 222 Cal.App.2d 174, wherein it states (pp. 179-180): "There was evidence that the cost of a pipe to carry the

---

[6]This result answers the query posed in *Burrows, supra,* by footnote 3, where the court said: "It is not clear from *Keys* whether the Supreme Court left room for the fourth possible permutation, namely, a situation where both are unreasonable."

water discharged from appellant's pipe across the respondents' land and to a public drain would be, as one witness put it, between four and five thousand dollars, and as another witness put it, between two and three thousand dollars. The trial court viewed the property and may have been of the opinion that construction of such a pipe would remedy the situation caused by appellant's trespass and restore the value of the land to what it has been. If that be true, then the court could properly conclude that the cost of the pipe measured the diminution in value of respondents' property."

The case of *Armstrong* v. *Francis Corp., supra,* 20 N.J. 320 [120 A.2d 4, 59 A.L.R.2d 413] cited by the court in *Keys* involved a situation somewhat similar to the instant case. In that case, defendant, in the course of developing a large housing project, substantially augmented the flow of surface water through a natural channel on plaintiff's land, causing considerable damage. The court, following the rule of reasonable use, entered a decree requiring the defendant to pipe the channel so as to protect the plaintiff's land. There is no indication that the plaintiff made any alterations in his property to protect it from the increased flow of surface water. The court held that while home-building projects are socially beneficial, there was no reason why the economic cost incident to the expulsion of surface waters should be borne by the adjoining landowners, rather than by those undertaking such projects for profit. (Cf. *Pagliotti* v. *Acquistapace, supra,* 64 Cal.2d 873.)[7]

Upon an examination of the record, we have determined that there is substantial evidence to support a finding that plaintiff acted reasonably in relation to his property.[8] ▇ So far as the County is concerned, however, we conclude that the increased use of plaintiff's ditch, as a result of the improvement, is in the nature of inverse condemnation (Code Civ. Proc., § 1238);[9] that the County is not, as a matter of law, prohibited from increasing a servitude if such increase is without unreasonable damage to the owner of the servient estate and compensation for any diminution in the property's value is paid by the County. (*Granone* v. *County of Los Angeles,* 231 Cal.App.2d 629, 646 [42 Cal.Rptr. 34].) The effect of *Keys* and *Pagliotti,* then, is to point the way for complete recovery by a property

---

[7]For general discussions of the conflicting rules relating to surface water disputes, see 39 So.Cal.L.Rev. 128, Comment, *California Surface Waters;* 17 Hastings L.J. 826, Note, *California Surface Waters;* and Witkin, Summary of Cal. Law (1969 Supp.), § 328 A, Real Property.

[8]While a lower landowner's failure to take affirmative action to protect his property does not necessarily mean he is denied relief against the upper landowner, his lack of action may be relevant in computing the damages to which he is entitled. (See also fn. 6 herein, p. 730.)

[9]The question of damages for which Gibco may be liable is discussed *infra,* beginning on page 735.

owner whose property is damaged by the actions of another. Against public bodies, when the damage is incurred by virtue of a public improvement, the right of action is in accordance with the rules established in inverse condemnation; where the damage is done by a private party (private person without powers of condemnation such as those enjoyed by public utilities or educational institutions (*University of Southern Cal.* v. *Robbins,* 1 Cal.App.2d 523 [37 P.2d 163])), there is, of course, no action in inverse condemnation, but a similar result obtains. *Keys* and *Pagliotti* are expressions of that same conflict that Arvo Van Alstyne noted in his article, *Statutory Modification of Inverse Condemnation: The Scope of Legislative Power,* 19 Stan.L.Rev. 727, at page 735: "Inverse condemnation epitomizes a struggle between the security of 'established economic interests' and 'the forces of social change' which cannot be rationally resolved by a mere search for definitions."

Defendant County's liability for inverse condemnation is predicated upon article I, section 14 of the California Constitution, which provides that "[p]rivate property shall not be taken or damaged for public use without just compensation having first been made to . . . the owner. . . ." " 'Inverse condemnation' is the name generally ascribed to the remedy which a property owner is permitted to prosecute to obtain the just compensation which the Constitution assures him when his property without prior payment therefor, has been taken or damaged for public use." (Van Alstyne, *Inverse Condemnation, supra,* at page 730.)

In *Albers* v. *County of Los Angeles,* 62 Cal.2d 250 [42 Cal.Rptr. 89, 398 P.2d 129], the State Supreme Court, construing article I, section 14, held that, with two exceptions, any actual physical injury to real property proximately caused by a public improvement as deliberately designed and constructed, whether or not foreseeable, entitles the injured landowner to recovery for inverse condemnation. The two exceptions set forth in *Albers* involved situations like those in (1) *Gray* v. *Reclamation Dist. No. 1500,* 174 Cal. 622 [163 P. 1024], where it was held that damage resulting from a legitimate exercise of the state's police power (in that case, flood control, navigational improvement, and reclamation work) is noncompensable provided the "proper limits" of that power have not been exceeded; and (2) *Archer* v. *City of Los Angeles,* 19 Cal.2d 19 [119 P.2d 1], where the state, as an upper riparian owner, has the right to inflict the damage (discussed *infra,* at p. 740). In *Gray,* the court noted that future flooding would be eliminated as soon as the balance of the project was completed, and that the plaintiffs would derive substantial long-term benefits from the abatement of flood damage and improvement of navigation. Thus, the first exception noted by *Albers* is inapplicable to the instant case.

It is not clear whether, by holding that the landowner could recover whether or not the damage to his land was a foreseeable consequence of the public improvement, the court in *Albers* impliedly disapproved earlier cases reaching a contrary result. (See, e.g., *Bauer* v. *County of Ventura,* 45 Cal.2d 276 [289 P.2d 1] (which had held that a plaintiff could not recover against a public entity in inverse condemnation without the pleading and proving of a claim actionable against a private person under analogous circumstances); *Frustuck* v. *City of Fairfax,* 212 Cal.App.2d 345 [28 Cal.Rptr. 357].) In his article, *Unintended Physical Damage,* 20 Hastings L.J. 431 at 493-495, Arvo Van Alstyne observes: "*Albers* may simply embody an implicit hypothesis that practically every governmental decision to construct a public improvement involves, however remotely, at least some unforeseeable risks that physical damage to property may result. In the presumably rare instance where substantial damage does in fact eventuate 'directly' from the project [fn. omitted], and is capable of more equitable absorption by the beneficiaries of the project (ordinarily either taxpayers or consumers of service paid for by fees or charges) than by the injured owner [fn. omitted], absence of fault may be treated as simply an insufficient justification for shifting the unforeseeable loss from the project that caused it to be [*sic*] the equally innocent owners. Absence of foreseeability, like the other factual elements in the balancing process, is, in effect, merely a mitigating but not necessarily exonerating circumstance." Since it was the trial court's finding that the County acted unreasonably in accepting the dedication of Deodara and Oliveras Streets, the layout of which caused the defective drainage of Mendocino Street, we are not required to resolve the question posed by Professor Van Alstyne.[10]

Citing *Bauer* v. *County of Ventura, supra,* and *Granone* v. *County of Los Angeles, supra,* 231 Cal.App.2d 629, Van Alstyne, *Inverse Condemnation, supra,* notes (pp. 731-738): "[T]he constitutional remedy often overlaps normal tort remedies and provides an alternative basis of relief. . . . The law of governmental tort liability (or immunity) and the law of inverse condemnation have long been characterized by significant inter-relationships." But inverse condemnation does not involve ordinary acts of carelessness in the carrying out of the public entity's program. (*Miller* v. *City of Palo Alto,* 208 Cal. 74 [280 P. 108]; *Hayashi* v. *Alameda County Flood Control Dist.,* 167 Cal.App.2d 584, 591-592 [334 P.2d 1048]; *Western Assur. Co.* v. *Sacramento & San Joaquin Drainage Dist.,* 72 Cal.App. 68 [237 P. 59]; Leon Thomas David, *Municipal Liability in Tort in California,* Part III,

---

[10]For discussions of the impact of the *Albers* decision, see Note, *Inverse Condemnation, Foreseeability Abandoned in California: Albers v. County of Los Angeles,* 13 U.C.L.A. L.Rev. 871; Note, *Government Subdivisions Liable for Unforeseen Damagings Under California Inverse Condemnation Law,* 17 Stan.L.Rev. 763; Witkin, Summary of Cal. Law (1969 Supp.) Constitutional Law, § 212 A.

7 So.Cal.L.Rev. 214, 215-220.) Property is only deemed taken or damaged for a public use if the injury is a necessary consequence of the public project. (*Albers* v. *County of Los Angeles, supra,* pp. 263-264.) Van Alstyne (*Inverse Condemnation, supra,* at p. 781) states: "It now appears settled that if the construction or maintenance of a public project is designed to serve the interests of the community as a whole, any property damage caused by the project or by its operations as deliberately conceived is for a public use and is constitutionally compensable.[287] On the other hand, '[d]amage resulting from negligence in the routine operation having no relation to the function of the project as conceived' is not within the purview of section 14 [of Article I of the California Constitution.][288]" ■ Here, the increased burden upon plaintiff's ditch was a necessary consequence of the design of the tract and the creation and improvement of the streets, However, the overflow of the streets' crown, while resultant, was not a necessary consequence of the improvement to the higher ground. It is true that defendant County merely approved the plans and accepted the streets, leaving the actual planning and construction to a private contractor, but the County is not thereby shielded from liability.

The case of *Frustuck* v. *City of Fairfax, supra,* involved a situation factually similar to that presently before us. There, the development and improvement of higher lands resulted in an increase in the flowage of surface waters which naturally drained across plaintiff's lower property. These improvements diverted the storm waters from their natural channels in such a manner that the additional water could not be handled by the existing 20-inch culvert which ran beneath the street to a ditch located on plaintiff's property. The excess water overflowed onto plaintiff's land. To alleviate this condition, the City enlarged the culvert carrying the waters to the plaintiff's ditch. The result was a flow of water which could not be handled by the ditch, and flooding occurred. The court found that there was created an increased burden to plaintiff's property, constituting inverse condemnation. The court stated (pp. 362-363): "The liability of the City is not necessarily predicated upon the doing by it of the actual physical act of diversion. The basis of liability is its failure, in the exercise of its governmental power, to appreciate the probability that the drainage system from Marinda Oaks to the Frustuck property, functioning as deliberately conceived, and as altered and maintained by the diversion of waters from their normal channels, would result in some damage to private property. (*Youngblood* v. *Los Angeles County Flood Control Dist., supra,* 56 Cal.2d 603, 607 [15 Cal.

---

"[287]*See Bauer* v. *County of Ventura,* 45 Cal.2d 276, 289 P.2d 1 (1955); *Granone* v. *County of Los Angeles,* 231 Cal.App.2d 629, 42 Cal.Rptr. 34 (2d Dist., 1965); *Ambrosini* v. *Alisal Sanitary Dist.,* 154 Cal.App.2d 720, 317 P.2d 33 (1st Dist. 1957).

"[288]*Bauer* v. *County of Ventura, supra,* note 287, at p. 286, 289 P.2d at p. 7 (dictum)."

Rptr. 904, 364 P.2d 840]; *Bauer* v. *County of Ventura, supra,* p. 285; *Ward Concrete Products Co.* v. *Los Angeles County Flood etc. Dist.,* 149 Cal. App.2d 840, 846-847 [309 P.2d 546].) Drainage systems concern the whole community. Their construction and maintenance become a matter of public policy and are subjects of independent statute. (*Bauer* v. *County of Ventura, supra,* p. 285.) They are, as here, proper subjects for the required approval by public agencies. The approval of the subdivision maps and plans which include drainage systems, as well as the approval which we are entitled to presume was given to the construction and the improvement on the church property by the City in the performance of official duty (Code Civ. Proc., § 1963, subd. 15), constitute a substantial participation incident to the serving of a public purpose. Such drainage systems when accepted and approved by the City become a public improvement and part of its system of public works. (*Steiger* v. *City of San Diego,* 163 Cal.App.2d 110 [329 P.2d 94].) The fact that the work is performed by a contractor, subdivider or a private owner of property does not necessarily exonerate a public agency, if such contractor, subdivider or owner follows the plans and specifications furnished or approved by the public agency. When the work thus planned, specified and authorized results in an injury to adjacent property the liability is upon the public agency under its obligation to compensate for the damages resulting from the exercise of its governmental power. (*Heimann* v. *City of Los Angeles,* 30 Cal.2d 746, 756 [185 P.2d 597]; *Steiger* v. *City of San Diego, supra,* 163 Cal.App.2d 110, 113; *Alisal Sanitary Dist.* v. *Kennedy,* 180 Cal.App.2d 69, 82 [4 Cal.Rptr. 379].)" In the instant case, the defendant County is liable to the plaintiff for the same reasons as expressed in *Frustuck,* upon its approval of the plans.

Gibco's liability, however, is a different question. ■ In the absence of something in the nature of a protective covenant, where a public entity approves the plans for a subdivision, including a drainage system, and there is damage to adjacent property as a result of those improvements, the public entity, not the subdivider, is liable in an inverse condemnation suit. (*Eachus* v. *City of Los Angeles,* 130 Cal. 492 [62 P. 829, 80 Am. St. Rep. 147]; *Steiger* v. *City of San Diego,* 163 Cal.App.2d 110, 113 [329 P.2d 94]; *Anderson* v. *Fay Improv. Co.,* 134 Cal.App.2d 738, 745 [286 P.2d 513].)

The whole of the injunction goes to the manner of discharging waters, none of which are within the control of defendant Gibco. We do not say that a prohibitory injunction against active negligence on the part of Gibco to the extent it may still have property interests in the tract would not be proper. This, however, is not the purport of the injunction as ordered. As we have heretofore noted in footnote 1, there has been a waiver of appeal by Gibco from that portion of the judgment relative to the damage award of $50. There is no evidence of negligent conduct by Gibco con-

tributing to or causing the water or mud flow other than would naturally result from the terrain alteration and the concentration of the surface waters into the streets. We can readily envisage a situation where a subdivider, during development of the property, may have a duty to prevent ground erosion and the depositing of soil or debris on the land of the lower owner. It would seem reasonable to require a subdivider to take preventive measures to preclude such incidents, and nothing we say here negates responsibility for such negligence, but that is not encompassed in the problem now before us. What the facts here establish is that the surface waters' run-off was increased in volume, and was directed and concentrated into the public street in the expected fashion occasioned by the approved subdivision plan. Thus, the diversion in question, so far as Gibco was concerned, was only the drainage of surface waters by an abutting property owner into a public street. As was stated in *Portman* v. *Clementina Co.*, 147 Cal.App.2d 651, 659-660 [305 P.2d 963]: "[O]ur Supreme Court, in *Shaw* v. *Sebastopol*, 159 Cal. 623 [115 P. 213] and *Richardson* v. *City of Eureka*, 96 Cal. 443 [31 P. 458] treated the drainage of surface waters over a public street as a use thereof by abutting property owners which could not be unlawfully obstructed."

For that reason, inverse condemnation is an accomplished fact as to any diminution in value of plaintiff's property caused by the additional burden placed on the ditch, and an injunction will not lie where the damage to plaintiff is not unreasonable under the propriety of the improvement. (Cf. *Hassell* v. *City & County of San Francisco*, 11 Cal.2d 168 [78 P.2d 1021]; *Andrew Jergens Co.* v. *Los Angeles*, 103 Cal.App.2d 232 [229 P.2d 475], where an injunction was the proper remedy to prevent prospective developments.) Except for the minor clean-up recovery for the mud occasioned during tract development and the over-crown run-off via the plaintiff's driveway, plaintiff's action must be limited to damages for the loss in value of his property. Had plaintiff acted prior to the construction of the tract and the streets, an injunction might well have been the proper remedy to limit the burden on the ditch to preexistent prescriptive rights. But he cannot now require the County to undo that which has been accomplished and which does not create an unreasonable increase in the burden which the land already bore. ■■■ As the court in *Frustuck* stated (pp. 370-371): "The general rule is that where a taking of private property for public use *is attempted* under the power of eminent domain without any provision having been made for compensation, an injunction will lie. (*Beals* v. *City of Los Angeles, supra*, 23 Cal.2d 381, 388 [144 P.2d 839]; *Geurkink* v. *City of Petaluma*, 112 Cal. 306, 309 [44 P. 570].) If the property *has been taken* for a public use without any provision being made for compensation, an unqualified injunction may be refused if a public use has intervened. (*Beals* v. *City of Los Angeles, supra*, p. 388.) Accordingly, it has been held

that when a public use *has attached*[,] a prohibitory injunction should be granted only in the event no other relief is adequate. (*Hillside Water Co. v. City of Los Angeles,* 10 Cal.2d 677, 688 [76 P.2d 681]; *Peabody v. City of Vallejo,* 2 Cal.2d 351, 378 [40 P.2d 486].) ▆▆ The appropriate course to pursue when such a use has attached is to sue for damages in inverse condemnation, and unless the plaintiff can show good reason why such remedy would not be adequate, he is not entitled to an injunction where a public use has intervened. (*Hillside Water Co. v. City of Los Angeles, supra,* p. 688. ▆▆ Moreover, where a property owner permits the completion by a public agency of the work which results in the taking of private property for a public use he will be denied the right to enjoin the agency. His only remedy under such circumstances is a proceeding in inverse condemnation to recover damages. (*Lamb v. California Water & Tel. Co.,* 21 Cal.2d 33, 41 [129 P.2d 371]; *Peckwith v. Lavezzola,* 50 Cal.App.2d 211, 219-220 [122 P.2d 678]; see *Podesta v. Linden Irr. Dist.,* 141 Cal.App.2d 38 [296 P.2d 401].)"

There have been cases wherein injunctions, both mandatory and prohibitory, have issued. One such case (*Robinson v. County of San Diego,* 115 Cal.App. 153 [300 P. 971]) compelled a public entity to alter street improvements which occasioned the flooding of a plaintiff's land. There, the County caused a highway to be graded and lowered and ditches to be constructed on both sides thereof so that surface waters were diverted, thus causing them to flow onto plaintiff's property. The court perpetually enjoined the County from so diverting the waters that had not previously flowed upon plaintiff's property. However, as the court there recognized, the record of the trial was unintelligible, and it is therefore impossible for us to determine whether the ditches causing the diversion were temporary or permanent. In *Los Angeles Brick & Clay Products Co. v. City of Los Angeles,* 60 Cal.App.2d 478 [141 P.2d 46], and the case it relied upon, *Farrell v. City of Ontario,* 36 Cal.App. 754 [173 P. 392], mandatory injunctions were issued. The injunctive relief cases such as *Robinson, Farrell,* and *Los Angeles Brick* treat the diversion of surface waters as a nuisance, and not as a necessary consequence of the public improvement. ▆▆ While it is true that the surface water diversion may not be a part of the public improvement, nevertheless the resultant run-off and diversion, where intended, is caused by the improvement. Where the public use of the improvement obtains, the damages which also result and which are attached thereto are within the authority of the agency causing the improvement, to the same extent as is the improvement itself. (*Granone v. County of Los Angeles, supra,* 231 Cal.App. 629 at p. 646.) ▆▆ In cases such as the one before us, neither the consequentially injured party nor the courts may superimpose corrective authority upon public works already created unless they are negligently constructed, or constructed in a manner unnecessary

to the public improvement. Distinct from those already created are those not yet existent, for then the relative merits of injury may be weighed against the benefits to the public. As we have pointed out, the use of the ditch, by the increase of its burden, did not cause a different injury, though it may well have constituted a diminution in property value for which plaintiff may recover. This portion of the improvement was designed to accomplish the very result of which plaintiff complains. The over-crown run-off, however, is but the result of negligent design of the crown height or road pitch, and has no relationship to the reasonableness of the public improvement sought to be created. As to such unnecessary, unintentional, and negligently created consequences of the public improvement, we see neither logic nor reason which prohibits the issuance of an injunction to prohibit the maintenance thereof. Our conclusion in this respect reconciles the cases which have issued an injunction with the later cases such as *Frustuck*.

We note that those cases in which an injunction has issued were decided before *Spaulding* v. *Cameron*, 38 Cal.2d 265 [239 P.2d 625]. In *Spaulding*, the court stated (at p. 267): "In early decisions of this court it was held that it should not be presumed that a nuisance would continue, and damages were not allowed for a decrease in market value caused by the existence of the nuisance but were limited to the actual physical injury suffered before the commencement of the action. (*Hopkins* v. *Western Pac. R. Co.*, 50 Cal. 190, 194; *Severy* v. *Central Pac. R. Co.*, 51 Cal. 194, 197; see, also, *Coats* v. *Atchison, T. & S. F. R. Co.*, 1 Cal.App. 441, 444-445 [82 P. 640].) The remedy for a continuing nuisance was either a suit for injunctive relief or successive actions for damages as new injuries occurred. Situations arose, however, where injunctive relief was not appropriate or where successive actions were undesirable either to the plaintiff or the defendant or both. Accordingly, it was recognized that some types of nuisances should be considered permanent, and in such cases recovery of past and anticipated future damages were [*sic*] allowed in one action. (*Eachus* v. *Los Angeles Consol. Elec. Ry. Co.*, 103 Cal. 614, 622 [37 P. 750, 42 Am.St.Rep. 149]; *Williams* v. *Southern Pac. Co.*, 150 Cal. 624, 626-628 [89 P. 599]; *Rankin* v. *DeBare*, 205 Cal. 639, 641 [271 P. 1050]; see McCormick on Damages, § 127, pp. 504-505.)" We do not believe, however, that *Spaulding* has actually overruled the rationale behind *Los Angeles Brick* and the other cases cited. It does point the way to the ruling of *Frustuck*. If the earlier cases present a conflict in theory, we believe the better rule applicable to situations where a public entity has completed its improvements is expressed in *Frustuck*.[11]

---

[11]"Judicial action in the area of inverse condemnation has not been entirely satisfactory; most authorities readily acknowledge that the case law is disorderly, incon-

██ In the instant case, the injunction is proper as it relates to the over-crown run-off, and a mandatory injunction could issue ordering the County to cease engaging in such acts of negligence in the maintenance of the inadequate drainage system. In *Hayashi* v. *Alameda County Flood Control,* 167 Cal.App.2d 584, at pp. 591-592 [334 P.2d 1048], the court states: "The most recent cases have made a distinction between negligence which occurs when a public agency is carrying out a deliberate plan with regard to the construction of public works, and negligence resulting in damage growing out of the operation and maintenance of public works. These cases hold that the damage resulting from the former type of negligence is compensable under article I, section 14, whereas damages resulting from the second type of negligence are not recoverable in an inverse condemnation proceeding, but are recoverable, if at all, only in a negligence action. (*Bauer* v. *County of Ventura,* 45 Cal.2d 276 [289 P.2d 1]; *Ward Concrete Products Co.* v. *Los Angeles Flood etc. Dist.,* 149 Cal.App.2d 840 [309 P.2d 546]; *Youngblood* v. *City of Los Angeles,* 160 Cal.App.2d 481 [325 P.2d 587].) It has been definitely held that a property owner may not recover in an inverse condemnation proceeding for damages caused by acts of carelessness or neglect on the part of a public agency. (*Neff* v. *Imperial Irrigation Dist.,* 142 Cal.App.2d 755 [299 P.2d 359].) In the present case the district did not cause the original break in the levee, nor is it charged that such occurred by reason of negligence. Negligent design or construction is not charged, nor did the district deliberately divert the water onto the plaintiffs' lands. It is charged with negligent failure to act thereafter, that is, with negligence in the operation and maintenance of its property. In our opinion that does not charge a taking of property for public use under the Constitution."

██ Inverse condemnation does not involve ordinary negligence, but rather, damages which are a natural consequence of the public improvement. (*Western Salt Co.* v. *City of Newport Beach,* 271 Cal.App.2d 397 [76 Cal.Rptr. 322].) ██ The injunction as issued, however, exceeds the bounds of judicial authority in the instant case as it relates to the increased use of the ditch. Were it to be approved in that respect, it would authorize an injunction which would effectively negate the power of the government to take property through inverse condemnation.

██ While plaintiff did not specifically allege that his property had been taken or damaged for a public purpose and therefore inversely condemned, his first amended complaint did allege facts which would support a cause of action for inverse condemnation. The pleading alleges that

sistent, and diffuse. [Footnote omitted.]" (Van Alstyne, *Inverse Condemnation, supra,* p. 732.)

defendant County allowed the construction of a subdivision on the land above his property; that defendant County allowed the construction of and accepted the streets on said land; that said construction reduced the natural drainage area on said land, causing substantial amounts of surface water to be discharged onto his property and overload his drainage ditch; and that these surface waters continue to be discharged onto his land. These facts, if true, constitute a taking by way of damage to plaintiff's land and for a public purpose. Adequate and timely notice and demand are alleged. Thus, a cause of action in inverse condemnation is substantially set forth, though subject to improvement by amended pleading.

Defendants contend on appeal that plaintiff's drainage ditch is a natural water course. However, neither defendant raised this theory until defendant County argued it in its Points and Authorities dated November 1, 1967. Neither defendant set forth in any pleading any allegation that the ditch was a natural water course. Neither defendant requested or moved to conform any pleading to any evidence concerning the issue of a natural water course. On March 3, 1967, plaintiff, in his proposed findings of fact, included a finding that the drainage ditch was not and had never been a natural water course. The defendants objected to this proposed finding on the ground it was unnecessary, and the court deleted it, indicating that the proposed finding concerning defendants' prescriptive rights covered the point. Defendants did not request a special finding on the issue of a natural water course. ▇ The defendants may not now complain on appeal of defects in the court's findings for which they are responsible. (*Fontana* v. *Upp,* 128 Cal.App.2d 205, 211 [275 P.2d 164]; *Tucker* v. *Cave Springs Min. Corp.,* 139 Cal.App. 213, 218 [33 P.2d 871].) ▇ "It is fundamental that an appellant cannot change the theory of his case after the failure of his strategy in the trial court." (*Arthur* v. *London Guar. & Acc. Co.,* 78 Cal.App.2d 198 [177 P.2d 625].) Therefore, defendants are not entitled to appellate consideration of this, issue.

However, on the evidence in the case before us, we would conclude that defendants' arguments would fail on the merits. Pursuant to exception (2) set forth in *Albers,* the County correctly argues that an upper landowner may discharge surface waters into a natural water course and increase its volume without subjecting itself to liability for any damage suffered by a lower landowner, even if the stream channel is inadequate to accommodate the increased flow. (*Archer* v. *City of Los Angeles, supra,* 19 Cal.2d 19.) It is the County's contention that because of its long continued use, plaintiff's drainage ditch constitutes a natural water course. It relies on the cases of *Clement* v. *State Reclamation Board,* 35 Cal.2d 628 [220 P.2d 897] and *San Gabriel Valley Country Club* v. *County of Los Angeles,*

182 Cal. 392 [188 P. 554, 9 A.L.R. 1200]. These cases involved artificial changes to already existing natural water courses. In *Clement,* the court held that levees constructed by farmers along the banks of the Sacramento River had, after long continued maintenance, become the natural banks of the river. ▇▇ A mere canal or ditch, on the other hand, will not be considered a natural water course unless it is a mere enlargement or alteration of an existing natural water course, even though it is the most convenient way to drain the land. (*Darr* v. *Carolina Aluminum Co.,* 215 N.C. 768 [3 S.E.2d 434]; 93 C.J.S., Waters, § 129.) Moreover, a natural water course must be fed from other and more permanent sources than mere surface waters unless they naturally converge to form a definite channel. (*Sanguinetti* v. *Pock,* 136 Cal. 466 [69 P. 98, 89 Am.St.Rep. 169]; *Los Angeles Cemetery Assn.* v. *City of Los Angeles,* 103 Cal. 461 [37 P. 375]; *South Santa Clara Valley Water Conservation Dist.* v. *Johnson,* 231 Cal.App.2d 388 [41 Cal.Rptr. 846]; 93 C.J.S., Water, § 3.)

We have heretofore discussed the right of the County to increase the burden upon the ditch, provided recompense for diminution of value, if any, is paid under the theory of inverse condemnation. Plaintiff's complaint, however, goes beyond the problem of excess water in his ditch. His complaint is that the water races down the new street, across Mendocino, and down his driveway, flooding across his yard, depositing debris, as well as causing erosion. We are therefore not confronted with the narrow problem of increased waters through the ditch, as the County would suggest. It may be that one means of reducing the plaintiff's damage would be to adequately corral the waters so as to funnel them through the ditch, but this is not the sole problem presented on this appeal. Likewise, it is no defense that, on afterthought, the County conceived of a preventive measure which might have been taken by plaintiff but was not, if plaintiff's not having foreseen the preventive measure was not unreasonable. ▇▇ Also, where the preventive measure is one which might reasonably be expected to be taken by the County, its failure to take such precaution goes directly to the unreasonableness of its actions. In the instant case, the County suggests that a grate and drain could have been constructed by plaintiff at his driveway apron to funnel the waters across his land to the drainage ditch. While this may be a possible solution, it goes more to the damage occasioned by the introduction of the waters onto plaintiff's property than to the issue of reasonable or unreasonable action by plaintiff. (*Frustuck* v. *City of Fairfax, supra,* pp. 368-369.) Certainly, whatever plaintiff must erect on his property, he is entitled to both the cost of such erection and the damage caused by the burden requiring such protective structures. ▇▇ As the court in *Albers* observed (at pp. 269-273): "On the issue now before us the general rule is that an owner whose property

is being taken or damaged by a public entity is under a duty to take all reasonable steps available to minimize his loss. (18 Am.Jur., Eminent Domain, § 262, p. 903; 29 C.J.S., Eminent Domain, § 155, p. 1015, fn. 69; 4 Nichols on Eminent Domain (3d ed. 1962) § 14.22, p. 525.) . . .

"No reason appears why the rule in California should be harsher than that of our sister states. No overriding public policy demands that in eminent domain proceedings in California the owner of property be denied recovery for expenses reasonably and in good faith incurred in an effort to minimize his loss [fn. omitted]. On the contrary, it would seem that the public interest would be served by allowing the possibility of such a recovery: the owner, who is ordinarily in the best position to learn of and guard against danger to his property, would thereby be encouraged to attempt to minimize the loss inflicted on him by the condemnation, rather than simply to sit idly by and watch otherwise avoidable damages accumulate. To the extent that the loss is minimized, of course, the amount of the public entity's liability to the owner is reduced; and adequate protection for the public entity would seem to be provided by the requirements of good faith and reasonableness (see *Zidel* v. *State* (Ct. Cl. 1949) *supra*, 198 Misc. 91 [96 N.Y.S.2d 330, 337]). . . .

"If, in accordance with the general rule and the dictates of public policy, the duty to mitigate damages is held to apply in eminent domain cases, the fair market value of the property taken or damaged will be *decreased* by the amount which the owners reasonably and in good faith spend in discharging that duty. Such amount can usually be determined with precision, as it was in the case before us. It is therefore unnecessary to draw a technical distinction between designating this amount as a separate item of damages or merely placing it on the debit side in computing the fair market value of the property after the taking; in either event the result will be the same."

The suggestion of the County above discussed might have been a solution to the problem; nevertheless, the obligation to prevent future damage from the County's maintenance of its negligently constructed street was that of the County. ▬ The burden is on the County to construct its streets in such manner as to accomplish the purpose for which they were intended. This includes providing the road with such crown or pitch as to divert the oncoming surface waters in the direction intended. If the approved design fails to meet the purpose for which it was created and the condition of the street results in causing damage, its maintenance in such condition may be enjoined, for the resultant damage is not "for the public use."

The issuance of the injunction, so far as it relates to the use of the ditch,

while erroneous and requiring reversal, was a clear attempt by the trial court to provide relief to plaintiff for the damage he has been occasioned. Though that remedy cannot be affirmed, the determination of liability need not be disturbed so far as defendant County is concerned. So far as the injunction related to over-crown run-off, the injunctive relief is affirmed.

As to defendant County, the judgment is reversed as to the relief sought to be granted as to any increased use of the ditch for water diversion purposes only, and the case is remanded to the trial court on the issue of damages only, in conformity with this opinion.

As to defendant Gibco, the judgment is reversed as to both liability and damages.

Aiso, J., and Reppy, J., concurred.

The petition of the appellant County for a hearing by the Supreme Court was denied March 19, 1970.